UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 25-CR-10292-FDS |
| | ) | |
| JOHN MAGEE GAVIN, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

Defendant, John Magee GAVIN ("Defendant" or "GAVIN"), was a teacher at Josiah Quincy Upper School in Boston. This is particularly disturbing considering he has now pled guilty to coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), receipt of child pornography, in violation of § 2252A(a)(2)(A) and (b)(1), and possession of child pornography, in violation of § 2252A(a)(5)(B) and (b)(2). Alarmingly, this conduct, which was committed while GAVIN worked as an education professional, included possession of 147 files found on his phone that showed children naked or involved in sexual acts. Some of these files depicted girls as young as five to eight years old being raped by an adult male. GAVIN was not only viewing this content, but he was actively seeking out young girls to send him videos to add to his collection. In total, GAVIN reached out to approximately twenty minor females between the ages of 12 and 17 for the purpose of engaging in a sexually explicit conversation.

Again, this is particularly concerning considering that at the same time, GAVIN was a teacher of students who were the around the same age as many of his online victims. For the reasons outlined in the government's filings and to be articulated at the sentencing hearing, the government respectfully requests that this Court impose a sentence that includes incarceration for 10 years (120 months) and five years of supervised release.

## I.    Procedural History

On Thursday, December 11, 2025, the United States District Court (Saylor, J.) accepted the change of plea by the Defendant, to the Indictment alleging on one count of coercion and enticement, and attempt, in violation of 18 U.S.C. § 2422(b), receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1), and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

GAVIN faces the following mandatory minimum and maximum penalties on Count One: a mandatory minimum sentence of 10 years and up to life in prison; at least five years and up to a lifetime of supervised release; a fine of up to $250,000; a $100 mandatory special assessment; a $5,000 discretionary special assessment under 18 U.S.C. § 3014; restitution; and forfeiture to the extent charged in the Indictment.    Defendant faces the following mandatory minimum and maximum penalties for Count Two: a mandatory minimum sentence of five years and up to 20 years in prison; at least five years and up to a lifetime of supervised release; a fine of up to $250,000; $100 mandatory special assessment; a $5,000 discretionary special assessment under 18 U.S.C. § 3014; a $35,000 discretionary special assessment under 18 U.S.C. § 2259A; restitution; and forfeiture to the extent charged in the Indictment. Defendant faces the following maximum penalties for Count Three: a sentence of up to 20 years in prison; at least five years and up to a lifetime of supervised release; a fine of up to $250,000; $100 mandatory special assessment; a $5,000 discretionary special assessment under 18 U.S.C. § 3014; a $17,000 discretionary special assessment under 18 U.S.C. § 2259A; restitution; and forfeiture to the extent charged in the Indictment. *See* cover sheet of Presentence Investigative Report("PSR"), PSR ¶¶ 87, 90, 91, & 95 – 98.

The parties have entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C). In it, the parties stipulate to the following agreed upon disposition: incarceration for a period 120 months; a period of 60 months of supervised release; a mandatory special assessment of $300; the JVTA assessments, unless the Court finds that Defendant is not able, and is not likely to become able, to pay;  the AVAA assessments, unless the Court finds that Defendant is not able, and is not likely to become able, to pay; restitution in an amount to be determined at sentencing; forfeiture as outlined in the plea agreement; and a fine within the Guidelines range as calculated by the Court at sentencing, excluding departures, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine.

## II.    Factual Background

On January 06, 2025, the Brookline Police Department ('BPD") received a notification from the Tennessee Bureau of Investigation ("TBI") of an investigation that they were conducting regarding a child exploitation case, which was based on an ICAC Tip. TBI informed BPD that the father of a thirteen-year-old female minor ("Initiating Victim") reported that she was speaking with older men on an online app, Discord and exchanging nude images. At the time of the incident, the Initiating Victim was twelve years old when she began exchanging messages with adult men.

TBI received written consent from the Initiating Victim's parents to search through her phone. Law enforcement conducted a preliminary search of the phone and discovered numerous chats on Discord between the Initiating Victim and other males. Through the preliminary examination of the phone, law enforcement found several accounts and messages where the Initiating Victim was communicating with adult males. The Initiating Victim and the men would discuss their ages and that the messages were sexual in nature and eventually lead to the

exchanging of nude images and or videos. One message thread was with a subject with a username, **john90** and a Discord User ID: **75978761310732812**.

TBI investigators submitted an administrative subpoena to Discord for that account information, which identified the accountholder's phone number, numerous IP addresses, and emails associated with the account. The phone number registered under this account was **413-429-5829** with an email address **xbox360king1990@gmail.com**. TBI investigators submitted a subsequent administrative subpoena to Comcast for the subscriber information for the associated IP addresses for the Discord account, which was chatting with the Initiating Victim. These records revealed that the subscriber was GAVIN with an address of 50 BROWNE ST APT 2, BROOKLINE, MA 02446-7040. In addition, the registered phone number corresponded with the phone number associated with the Discord subscriber account. BPD also determined that the same phone number was used by GAVIN in 2020 when he filed a report with police after his bike was stolen.

Investigators learned that GAVIN was a former 6th grade teacher at the Academy of the Pacific Rim Charter Public School located in Hyde Park. An open-source search of GAVIN also showed that he was a paraprofessional with the Brookline Public Schools and with the assistance of the Boston Police ICAC Unit, investigators later confirmed that GAVIN was, up until the time of his arrest, a public-school teacher at the Josiah Quincy Upper School in Boston.

On February 2, 2025, a search warrant for GAVIN's username, john90#0, on social media platform, Discord, was executed. Discord produced the requested chats and other related data, which were analyzed. Several chat messages reviewed by investigators showed that GAVIN had been messaging with multiple underage females between the ages of 12 and 17 years old ("MVTs") throughout the country including GA, TX, TN, WV, NC, and FL, as well as outside of the US to

include the UK and Canada, in total approximately twenty MVTs.  Within these chats, GAVIN engaged in sexual conversations and often asked the MVTs to provide pictures of themselves. A consistent theme to the chats was for both parties to disclose their actual ages in the beginning of the chat, and with GAVIN disclosing that he was a teacher.  The contents of the chats are largely sexual in nature with GAVIN often asking sexually charged questions to the MVTs to include if they are horny, how often they masturbate, their sexual experiences, as well as requests for them to send CSAM.

On February 7, 2025, a search warrant was executed by BPD on GAVIN's residence. Several items of evidence were seized, and GAVIN was arrested that same day. In addition to the digital evidence seized, investigators also obtained from GAVIN's apartment other items of evidentiary value including, several items of clothing: his spartan sleeveless shirt that matched the shirt that he was wearing in the Spartan race photo he sent to a number of his victims; his Christmas themed patterned suit jacket and pants he was wearing in one of the pictures he sent to a victim; and a maroon pair of pants that matched the pants he was wearing in a picture that he also sent of himself to one of his victims. In addition, during the search warrant detectives took photos of a pair of white Adidas sneakers that GAVIN was wearing in a picture he sent from his living room to Minor A on Discord. Detectives also photographed a Go Pro in a case that matched the one that was in his Spartan photo.



GAVIN was arrested by BPD that day and charged out of the Brookline District Court with

Enticing a Child Under 16, Obscene Matter to a Minor, Lascivious Pose/Exhibit Child in Nude, and Possession of Child Pornography.

On June 11, 2025, agents completed a review of evidence item #1B2 - a blue Apple iPhone (the iPhone), IMEI: 3543468910455213 taken from GAVIN during the search warrant. There is also a MacBook Air that the FBI's Regional Computer Forensic Lab could not get into due to encryption, however agents believe it may contain additional Child Sexual Abuse Material ("CSAM") on it. Agents located on the iPhone approximately 94 total images and 53 videos depicting CSAM. A review of the evidence found on the subject iPhone 15, revealed that all the files were split between the following file paths:

- File Path 1: \private\var\mobile\Containers\Data\Application\B304AF9C-BD08-422F-8D78-000537C5741C\Documents\Solo\"FILE NAME"

  o Per the GUID in File Path 1, I found it is for Mega and it contains 33 videos of CSAM, all with a "Last Accessed Date" of 8/6/2024.

- File Path 2: \private\var\mobile\Containers\Data\Application\CBC65D3F-6B92-4217-92F4-6D93E8EB9B47\Documents\Vault\"FILE NAME".

  o The GUID in File Path 2 shows that it is for a calculator video vault.

Three examples of the CSAM images and videos located are as follows:

1.)      **File Name:** IMG00105.JPG

**File Description:** This image depicts a prepubescent female, approximately 5-8 years old, based on size and body development. The prepubescent female is wearing a red and white long sleeve striped shirt with a white animated bunny on the front with black writing, that is covered by the prepubescent female's left hand. She is lying on her back on a blue blanket. Her eyes are closed, and she is nude from the waist down. At the bottom of the image an adult male's stomach and erect penis is visible and his penis is penetrating the prepubescent female's vagina.

2.)      **File Name:** IMG00106.JPG

**File Description:** This image depicts a prepubescent female, approximately 6-9 years old, based on size and body development. She appears to be completely nude, lying on her back, with her arms above her head. A cloudy liquid resembling semen is in and around her vagina, pelvic area, and stomach.

3.)          **File Name:** 15Yo Bath Mega Orgasm.mp4

**File Description:** This video is approximately seven minutes and 51 seconds in length, which depicts a minor female, approximately 13-16 years of age, based on size, body development, and facial features.  She is alone in a bathroom and begins the video wearing a grey tank top and denim shorts.   She proceeds to strip naked and draw a bath.   She then enters the bath and rubs water over her breasts and manipulates her vagina with her hands.  The minor female then adjusts the camera and positions her vagina under the faucet of the tub.   The minor female moans as the water runs over her vagina.

Of the files of CSAM located within the iPhone, sexually explicit acts with minors were observed.  The sexually explicit acts observed within the CSAM files include vaginal, and anal penetration of minors. The ages of the minors depicted in the CSAM files range from approximately 5 to 17 years old.   The majority of the CSAM files depict minor females but there were also CSAM files depicting minor males as well, to include oral sex on a minor male. GAVIN's collection of CSAM included six identified series or known series according to NCMEC.

In light of the digital evidence recovered from GAVIN's phone, Agents also reviewed the Discord search warrant return to connect the numerous chats between GAVIN and MVTs, in which GAVIN engaged in sexualized conversations (*including conversation while GAVIN was teaching and discussing girls in his class*), online masturbation sessions with MVTs, and the solicitation and exchange of images from the MVTs with content on his phone.

**10/15/2024 – Gavin discusses in chat how he believes there's a girl at school who likes him and the difference is that he actually gets to jerk off to Vic masturbates while the girl at school probably masturbates to him when she goes home**

(V): maybe that student like u just wants ur attention
(G): No I don't think so but I do think there is a girl who does like me
(V): Their actually smart for that tho bc if u think about it it's a good way to get someone (especially someone u like)
(V): Or maybe they just like being yelled at
(G): They just don't want to do work
(V): Like a crush or like obsession
(G): Idk I don't even teach her but I often go into the classroom if I hear it is noisy or I see her in the hallway and every time she says hi to me by name.
(G): Even if its multiple times in less then a minute or two
(V): Freshman
(G): Lol what
(V): Freshman always doing the most like
(G): Lol but don't you agree she probably has a little crush?
(V): Yes but she shouldn't bc we cant share u
(V): So ur not going to agree with me
(G): But here is the difference she probably goes home and thinks of me while fingering herself. You actually get to finger yourself while I jack off to you doing that

In particular, agents identified a chat between GAVIN and a 15-year-old female in Texas ("Minor A"). Agents observed that between January and November of 2024 communications between the two, which began with a discussion of their true ages (*Minor A also disclosing she was in the 9th grade*) within the first day of the chat. GAVIN also disclosed that he is a science teacher, and the messages then turned quickly into being extremely sexual in nature. Multiple images and videos of CSAM of Minor A (she confirmed were her during the CAFI), were then sent to GAVIN from Minor A throughout the chat spanning multiple months; GAVIN's receipt of this CSAM is documented in the DISCORD chats. Included in those CSAM images and video files that Minor A sent GAVIN, are two videos of her masturbating in the bathtub, digitally penetrating her vagina and anus.

| .john90#0 | Morning |
| .john90#0 | Maybe if your a good girl you will wake up with a pussy filled with daddy's cum |
| indecisive.ghostie_cal#0 | Don't stay up too late |
| indecisive.ghostie_cal#0 | Wish you were my teacher hehe |
| .john90#0 | Well then I guess you just gotta fall asleep then while i fuck you |
| indecisive.ghostie_cal#0 | Night sexy �href |
| indecisive.ghostie_cal#0 | Mmm hehe nope, but close |
| .john90#0 | Bummer |
| indecisive.ghostie_cal#0 | No tease for you tonight I guess 😔 |
| .john90#0 | Bummer was it you playing with that tight little cunt of yours thinking about if daddy was there to fuck it, fill it with cum and make it feel all better? |
| indecisive.ghostie_cal#0 | Not it not sending |
| indecisive.ghostie_cal#0 | Mmm I really fucking do |
| .john90#0 | Which I know you love to hear that I still cum from watching you play with that tight little cunt of yours |
| indecisive.ghostie_cal#0 | Hehe |
| .john90#0 | And always will be especially beautiful I go back and love watching the naughty videos and photos you used to send me |

In addition, agents identified a chat between GAVIN and a 13-year-old female ("Minor B"), from Georgia. Agents observed that between March and December of 2024 communications between the two, which began in about April of 2024 with a discussion of their true ages, contained extremely sexualized communications. GAVIN also received an image from Minor B – a close up of her vagina while she was masturbating. The photo was recovered during forensics.

## III.    Legal Framework

The United States Sentencing Guidelines ("Guidelines") are "the starting point and the initial benchmark" in sentencing. *Gall v. United States,* 552 U.S. 38, 49-50 (2007). Following the Supreme Court's decision in *Gall v. United States*, "District Court judges can choose sentences that differ from the Sentencing Commission's recommendations—provided of course that they stay within the range set by the statutes of conviction and consider the sentencing factors arrayed in § 3553(a)." *See* e.g., *Gall*, 552 U.S. at 41, 49–50 & n. 6. While *Gall* made the Guidelines advisory, "[t]his is not a blank check for arbitrary sentencing." *Id.* "Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing." *Id.* "The reason for this is simple. Congress wants judges to do their best to sentence similar defendants similarly" *See Booker,* 543 U.S. at 250–54, 259–60. "And starting with the Guidelines' framework—which gives judges an idea of the sentences imposed on equivalent

offenders elsewhere—helps promote uniformity and fairness." *See Gall,* 552 U.S. at 49; *Booker,* 543 U.S. at 245–60.

After consulting the Guidelines, the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a). *See Gall,* 552 U.S. at 50. In doing so, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a). The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; must impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training, or treatment. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(D). The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." *See Gall*, 552 U.S. at 50. [1]

"Variances are 'non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a),' while departures are a term of art referring to non-Guidelines sentences authorized and 'imposed under the framework set out in the Guidelines.'" *See United States v. Tirado-Nieves*, 982 F.3d 1 (1st Cir. 2020) (quoting *Irizarry*, 553

---

[1] "In reviewing a sentence for reasonableness, the Court of Appeals first examine whether, in arriving at sentence, the district court committed any procedural errors, such as failing to calculate, or improperly calculating, the advisory Guidelines range, treating the Guidelines as mandatory, failing to consider the statutory sentencing factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the Guidelines range" *See United States v. Contreras-Delgado*, 913 F.3d 232 (1st Cir. 2019).

U.S. at 714); *United States v. Adorno-Molina*, 774 F.3d 116 (1st Cir. 2014). After the guideline range is determined, the court may "depart" from the guideline range where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." *See Pepper v. United States*, 562 U.S. 476, 494 (2011). "If the court departs from the applicable guideline range, it shall state, its specific reasons for departure in open court at the time of sentencing and…shall state those reasons with specificity in the statement of reasons form." *See* 18 U.S.C. § 3553(c).

## IV.    Sentencing Guidelines Calculation

The Government agrees with the guideline analysis as determined by Probation in the PSR. *See* PSR ¶¶ 28-54. A final PSR was issued by U.S. Probation on February 26, 2026.  The PSR determined the total offense level to be 33, after including all relevant sentencing enhancements, the multiple count adjustment, and after granting a three-level reduction for acceptance of responsibility.  *Id*.  Based upon a TOL of 33 and a criminal history category ("CHC") of I, the PSR calculated the advisory guidelines sentencing range ("GSR") to be 135 – 168 months.  *See* PSR ¶¶ 58 – 61, 88.  These calculations by U.S. Probation in the PSR for GAVIN are consistent with, and identical to, the calculations agreed to by the parties in their signed plea agreement entered on the docket, December 11, 2025, during the Rule 11 Hearing. *See* ECF No. 21.

## V.    Legal Context

The Defendant's criminal actions of engaging in illicit sexualized communications with more than a dozen minor females ages twelve to seventeen for his own sexual gratification, are appalling.  The fact that someone who was an educator of children that same age would have such complete disregard for the welfare of these children is astounding.   Numerous courts have emphatically expressed the wretched consequences of child pornography.  In *United States v. Goff*, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Court noted:

11

> Children are exploited, molested, and raped for the prurient
> pleasure of [the defendant] and others who support suppliers of
> child pornography. These small victims may rank as 'no one else'
> in [the defendant's] mind, but they do indeed exist outside his
> mind. Their injuries and the taking of their innocence are far too
> real. There is nothing 'casual' or theoretical about the scars they
> will bear from being abused for [the defendant's] advantage.

"It is an unassailable proposition that '[c]hild pornography harms and debases the most

defenseless of our citizens.'" *See United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010), citing

*United States v. Williams*, 553 U.S. 285, 307 (2008). In *United States v. Cunningham*, 680

F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), the District Court

reasoned:

> There can be no keener revelation of a society's soul than the way
> in which it treats its children. Given the current statistics
> surrounding child pornography, we are living in a country that is
> losing its soul. Child pornography is a vile, heinous crime.
> Mention the term to your average American and he responds with
> immediate disgust and a sense of unease. However, once it enters
> the legal system, child pornography undergoes sterilization. The
> sterilization goes far beyond properly removing emotion from
> sentencing decisions. Images are described in the most clinical
> sense. Victims all too often remain nameless. The only emotions
> on display are those of defendants, sorry that their actions were
> discovered by law enforcement.

Additionally, Congress has repeatedly recognized that recidivism rates are particularly

high for sex offenders.[2] Courts have recognized this as well. The Eleventh Circuit has noted

that "child sex offenders have appalling rates of recidivism, and their crimes are under-reported."

*United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d

---

[2] *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders).

402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.)

## VI.    Application of Section 3553(a) Factors

The government's recommendation accounts for the factors that the Court must consider outlined in 18 U.S.C. § 3553(a).  The factors include, but are not limited to, the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, the need to deter the defendant and others, the need to protect the public from the defendant's crime, and the need to avoid unwarranted sentencing disparities.

For the reasons outlined in the government's filings, and those to be articulated at the sentencing hearing, the government submits that its recommended sentence is reasonable and necessary in this case to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and to protect the public.  The government understands that the Guidelines sentencing ranges for child exploitation crimes in general are quite high compared to the ranges for many other crimes that are prosecuted in federal courts.  That distinction is not without reason: both Congress, in setting the mandatory minimum sentence of incarceration applicable to the Defendant's offense of conviction, and the Sentencing Commission, in developing the Guideline and specific offense characteristics applicable to his conduct, clearly recognize that individuals who prey on the most vulnerable members of our society merit truly significant punishment that is commensurate with the harm they cause and the danger they pose.

In this case, the Defendant faces a 10-year mandatory minimum sentence and a Guideline term of imprisonment of between 11 and 14 years.  The government recognizes that for most

people, the prospect of that length of time in prison would be staggering. But so, too, is the Defendant's crime, the seriousness of which is difficult to overstate.

The Defendant's behavior in the wake of this case appears to be a well calculated script that he followed, as this case revealed evidence of similar conduct (manipulating young girls online and exploiting them, often using the fact he was a teacher as part of his script), but fortunately because of the incredible courage of the Initiating Victim and the quick work of her father supporting her, the Defendant's predatory predilection came to a quick conclusion.

**A. The Nature and Circumstances of the Offense**

The government urges the Court to consider the nature and circumstances of the offense, to recognize the extreme seriousness of his crime, to assess that crime for what it is, and for the enormous impact it has had on the minor victims and their families. *See* 18 U.S.C. § 3553(a)(1). The facts of this case were outlined at the Rule 11 Hearing and are additionally outlined in detail in the PSR. *See* PSR ¶¶ 10-23.

Again, the nature of GAVIN's offenses is particularly disturbing considering his career as a professional in adolescent education. The fact that the approximately 147 files found on his phone depicted children naked and involved in sexual acts being raped by an adult male: with some of these children being as young as five to eight years old is concerning. GAVIN, however, didn't only view this content, but actively sought out young girls to send him videos to add to his collection. In total, GAVIN reached out to approximately twenty minor females between the ages of twelve and seventeen for the purpose of engaging in a sexually explicit conversation and the creation of exploitative videos and images. At the same time, GAVIN carried out this deplorable behavior he was a teacher of students around the same age as his online victims. GAVIN's

messages to his victims demonstrate that the teacher-student relationship and power dynamic was something he frequently thought about and found sexually enticing.

There are hundreds of messages between GAVIN and his victims that demonstrate his sexual interest in children. There are multiple messages where GAVIN clearly solicits sexual photographs and videos from girls who told him that they were underage. There are direct quotes from GAVIN that demonstrate his sexual interest in students at Josiah Quincy, where he was a teacher. While GAVIN's conduct did not actively include the students at his school, it is clear from his messages and interest in teenage girls that he frequently fantasized about having sex with a student. Thus, his conduct was that much more disturbing because in addition to his large collection of child pornography, he was messaging underage girls while in a position of trust. However, importantly there is no evidence to suggest GAVIN carried out his online fantasies in the real world.

GAVIN was a career teacher and education professional in the Boston area. During his career, he has come into contact with hundreds, if not thousands of children who live in the Boston area. Here, there is substantial evidence showing GAVIN enticed minor victims into sending him "lewd videos and pictures" and that along with the images found on GAVIN's iPhone, which depict graphic sexual imagery of children being sexually assaulted by adult men, clearly support the sentence being requested by the government.

### B.  History and Characteristics of the Defendant

The overriding aspect of the now 35-year-old middle school teacher is his sexual interest in children.  This is supported by his repeated and intentional effort, via extensive involvement in on-line sexually charged  communications; connecting with more than a dozen young girls, he in fact succeeded in coercing and enticing Minor A and Minor B to engage in sending him sexualized

content. He communicated on-line with them and requested that they engage in sexually explicit conduct with themselves and send him images/videos of the same.

It is additionally concerning given this exploitation and the current charges that the Defendant has suggested that he would like to be an addiction recovery coach or return to a career in teaching when he is released, essentially working with vulnerable individuals or children. *See* PSR ¶ 75.

In his presentence interview with Probation, the Defendant related that he has been diagnosed with depression and obsessive-compulsive disorder and has had some prior instance of suicidal ideations. However, thankfully he has not had any thoughts of self-harm since his arrest. *See* PSR ¶¶ 72 & 73.  While it is unclear the details regarding or for how long the Defendant has been diagnosed with depression and obsessive-compulsive disorder, he did report that his symptoms are being appropriately managed by his medical prescriptions. *Id*.  Per the defendant, he does not have an issue with drugs or alcohol but is willing to explore treatment to enhance his credibility as a recovery coach; despite never suffering from addiction. *See* PSR ¶¶ 76 & 77.  He admits to consuming alcoholic drinks minimally, which appears to be fairly typical of adult behavior, and to using marijuana gummies every once in a while, but only in small amounts. *See* PSR ¶ 76.   All these statements illustrate that this Defendant knew exactly what he was doing when he intentionally and knowingly exploited young girls and further supports the recommended sentence.

This Defendant was raised in a relatively stable family, under steady socio-economic circumstances. The Defendant characterized his own childhood as one in which he "suffered several traumatic experiences". Nevertheless, he stated that he still maintains cordial relationships with his sibling and his biological mother and stepfather to this day. Despite this description, the

Defendant described his stepfather as being verbally abusive to him and his mother – his stepfather accordingly was often "easily irritated and frequently shouted at and threatened" both the Defendant and his mother. PSR ¶ 65. The Defendant – while he was never physically or sexually abused himself, nor in a home growing up with his family in which he was exposed to any substance abuse. However, in many ways worse, he did grow up in a home in which he was treated with indifference and as inferior on a regular basis. This sense of second-class status seems to permeate his recollection of his childhood, including his description of his final family move as a child, which he stated was in some way the result of his experience of being bullied in school for being an introvert. PSR ¶¶ 64 & 65. Certainly, at a surface level the Defendant appears to have lived a stable life with his family; one of relative means – especially compared to many Defendants who come through this Court – however away from the surface – the Defendant's stated childhood experience in one that also prominently includes painful memories of feeling meaninglessness and unworthy in his own family – and those feelings have clearly manifested real-world consequences that have stuck with him to today; and while these don't excuse his conduct, they do go a long way to explain his devolvement into his online presence and his ultimate predatory conduct. *Id.*

The seriousness of the crimes for which the Defendant now stands convicted cannot be underscored enough and it should not be minimized. He coerced and enticed young girls online and caused at least two minors to film it, creating child exploitation material of themselves. He has negatively affected the life of the Initiating Victim, Minor A, and Minor B through his criminal acts – and a dozen others who couldn't be represented in this case. In examining the seriousness of the offenses, the Court must review the harm to the victims. *See United States v. Cunningham*, 680 F. Supp 2d at 844, 855 (N.D. Ohio, 2010). Minor A and Minor B (and the Initiating Victim) will now have to worry for the rest of their lives about the images/videos they sent the Defendant;

are they out there being traded and used for gratification by others like the Defendant – while there is no indication of any dissemination at the moment, that is cold comfort for the victims and their families. Each time a sexually explicit image or video of a child is viewed, accessed, possessed, received, sent, or produced, that minor child is being re-victimized.

### C. The Requested Sentence Is Needed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, Afford Specific and General Deterrence, and to Protect the Public from Future Crime(s) of the Defendant

The seriousness of this crime for which the Defendant now stands convicted cannot be treated in a routine manner or without consideration for the long-term destructive impact it continues to have on the victims.   The Defendant has profoundly and negatively affected the life of these minors, teenage girls, whose innocence was robbed through his criminal actions.  In examining the seriousness of the offense, the Court must review the harm to the victims.  *See United States v. Cunningham*, 680 F. Supp 2d at 844, 855 (N.D. Ohio, 2010).  The continuing impact of the Defendant's crimes on these victims is reflected in the victim impact statements submitted by the victims and their families.

This includes the Initiating Victim's father.[3]  The devastating toll this case has taken on this minor victim is enormous and encapsulated by the victim impact statement of her father who wrote, in part:

> *"Since the offense, the initiating victim has not been the same child. I have watched fear replace comfort and anxiety replace peace. Their baseline sense of safety — something every child deserves—has been taken away. Simple, everyday moments that should feel normal now carry an undercurrent of distress. As a parent, it is devastating to see your child struggling with emotions they should never have had to learn how to manage."*

> *"What makes this especially painful is knowing where and how this happened. My child was accessed through a digital application(Discord) commonly available on Xbox*

---

[3] Initiating Victim's father has submitted a victim impact statement which was previously provided to U.S. Probation and to defense counsel.  A redacted copy of the same is attached hereto as Exhibit #1.

> *gaming systems and easily downloaded on any cell phone or electronic device—*
> *technology found in thousands of children's bedrooms across this country.Their*
> *bedroom, the place where they slept, played, and should have felt completely safe,*
> *became the place where that safety was shattered. As a parent, realizing that danger*
> *entered my child's life through something so common and trusted is a pain I will carry*
> *forever."*

*See* Exhibit 1.

The devastating toll this case has also taken on Minor A is enormous and well-articulated in another victim impact statement; in the impact statement by Minor A's mother[4] who wrote, in part:

> "*No parent ever thinks this is going to happen to their child, and we try everything we*
> *know to prevent it. However, online predators are always waiting for their opportunity to*
> *to take advantage of vulnerable children. My child and family were extremely affected by*
> *the defendant's action. My child has had to undergo counseling due to the extreme*
> *emotional damage. I can only hope that over time, my can recover*."

*See* Exhibit 2

Finally, the Defendant's child pornography collection contained approximately six identified series victims, and one of those series victims, or their parents/representatives, have submitted a victim impact statement.[5] The continuing impact that Defendant's crime have had on these series victims are reflected in the victim impact statement submitted in this case. The devastating toll on these minor victims is enormous and is most aptly summed up by the victim of the "Lexie" series, who submitted a statement describing the trauma they have experienced far better than the government ever could.

---

[4] Minor A's mother has submitted a victim impact statement which was previously provided to U.S. Probation and to defense counsel. A redacted copy of the same is attached hereto as Exhibit #2.

[5] The government previously provided U.S. Probation and defense counsel with a copy of the VIS' and has received confirmation from U.S. Probation Office that it has submitted them to the Court with the final Presentence Report.

In her victim impact statement, minor victim in the "Lexie" series, "Aster" wrote, in part:

"*I didn't understand the toll it would take on my relationships. Yet now, I see it's touched every one of them, not only my mother and brother but my extended family. My mother might feel guilty about not knowing I was abused and stopping it, but she never dealt with those feelings. Instead, she blamed me for it. When I was groomed by my abuser, I was treated better than my brother in different ways, which created discord in our relationship. My brother did not understand that it was out of my control because no one explained this to either of us. I was diagnosed with PTSD, anxiety, and depression. I thought I could put all of this behind me.*"

"*Knowing the pictures are out there will follow me my whole life until the internet dies has created intimacy issues for me in both relationships and friendships. For example, I do not like being along in a room with a man, even if it's a man that I know. In one instance, I auditioned alone in a room in front of a man I knew, and I had a panic attack. I became hypervigilant when I'm around strange men. This was a safe adult, who should be a safe adult, but the trail of trust is gone. It takes a long time for me to feel comfortable with anyone in a position of authority, and the power dynamic is always in their favor.*"

"*The marks and scars forever on my body, forever in my skin, forever in my mind. There is no escaping the dark deep hole chasing me with every car I see, every dark hallway, and every CVS. My heart stops and I can feel another piece of myself breaking off as if he took something more from me. Everyday this man takes something from me. The enjoyment of sitting in class, being with friends, I cannot go outside without constant reminders he still breathes the same air I do. I was ripped away from my innocence, degraded into a object simply for his sexual desire*".

*See* Exhibit 3

These victims are not abstractions or objects — they are real people who experienced repeated exploitation by the Defendant. A significant term of imprisonment reinforces, to the Defendant and to others who are tempted to follow in his footsteps, that these crimes are exceedingly grave in nature, it would serve as a deterrent, and it would thus promote respect for the law.

In short, it has caused untold heartache, anxiety and fear upon the minor victims and their families. The government asserts the requested sentence is "sufficient, but not greater than necessary," to account for this conduct and to accomplish the goals of § 3553(a). *See* 18 U.S.C. § 3553(a). Imposing serious penalties on those who coerce and entice minor children to engage in

sexually explicit, child pornographic conduct, serves the interests of the minor victims in this case and the public.

A sentence of 10 years followed by a period of supervised release for five years ensures that the Defendant is removed from the public and under the supervision of the Court for the next approximately 15 years. It will appropriately serve as both a general and specific deterrent to future conduct involving the coercion, enticement, and exploitation of children, and protect the public from further crime of the Defendant.   *See* 18 U.S.C. § 3553(a)(2)(B) and (C).   "[S]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor."   *Also, see United States v. Goldberg*, 491 F.3d 668, at 672 (7th Cir. 2007)(a sentence affects the life of the criminal and the lives of his victims); *see also Goff*, 501 F.3d at 261 (stating in child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing").

Imposing serious penalties on individuals who actively participate in the child exploitation market may also deter other individuals from joining in its ranks.  The Defendant exploited these middle-school age victims while hidden behind the veil of technology.  These victims are not an abstraction or an object, they are real people who experienced sexual exploitation by this Defendant; they are someone's daughter, granddaughter, niece, family, and friend.  A significant term of imprisonment reinforces, to the Defendant and to others who are tempted to follow in his footsteps, that this crime is exceedingly grave in nature, should act as a deterrent, and would promote respect for the law, as well as protect the safety of the public, in particular, children.  The best protection for the most vulnerable population in our society, namely, children, would be for

the Defendant to receive the recommended lengthy prison sentence, one that is recommended by the parties.

## VII.    SUPERVISED RELEASE CONDITIONS

As set forth above, the Defendant has demonstrated a clear sexual interest in minor children.    Per the plea agreement, the parties recommend a five-year term of supervised release. A lengthy term of supervised release is essential to ensure that Defendant completes a certified sex offender program selected by U.S. Probation, mental health evaluation and counseling as deemed appropriate by U.S. Probation, and that his computer use and access to children are restricted and monitored.  The government further requests the Defendant have no contact with Minor A, Minor B, the Initiating Victim, and any of the minors he was communicating with online prior to his arrest. In addition, the Defendant should have no contact with anyone under the age of 18 during the pendency of his supervised release except in the presence of another adult approved by U.S. Probation, including at work.  This condition is also recommended by U.S. Probation.  The government contends that all the mandatory and special conditions of supervised release as outlined in the PSR are appropriate and justified and should be imposed.  The Defendant's term of supervised release is also reasonable, as courts have approved much larger terms of supervised release.  *See, e.g., United States v. Allison*, 447 F.3d 402 (5th Cir. 2006) (affirming imposition of lifetime supervised release for defendant convicted of possession of child pornography); *United States v. Cope*, 506 F.3d 908, 916 (9th Cir. 2007) (affirming imposition of lifetime term of supervised release for defendant convicted of possession of child pornography who had a prior conviction for attempted sexual assault on a child).  Additionally, pursuant to the Sex Offender Registration and Notification Act and the laws of the Commonwealth of Massachusetts, Defendant is required to register as a sex offender and to keep that registration current.

22

## VIII.    <u>Restitution</u>

One restitution request, with supporting restitution materials, was made by certain of the Defendant's victims pursuant to 18 U.S.C. § 2259 and *Paroline v. United States*, 572 U.S. 434 (2014).  At a minimum, restitution in the amount of $3,000 for each victim who requests restitution is mandated by statute.  *See* 18 U.S.C. § 2559(b)(2)(B) and *see* 18 U.S.C. § 3663A.  The government seeks restitution in the amount of $5,000.  As of the filing of this memorandum, the Defendant has now confirmed that he is agreeing to pay this restitution amount as requested in this case.[6] The government has provided those restitution packet to defense counsel in this case.  The chart below contains a list of the series victims seeking restitution in this case, the amount requested by them, as well as the number of files of that victim, which was part of the Defendant's CSAM collection and/or CSAM distribution:

| <u>Series Name/(pseudonym)</u> | <u># of CSAM files</u> | <u>Restitution requested</u> |
| --- | --- | --- |
| Lexie/("Aster") | 2 files | $5,000 |
| Total: | | $5,000 |

The government submits that the restitution materials submitted on behalf of the victim listed above provides a sufficient basis upon which this Court can and should find that the requested awards are appropriate and reasonable in the context of this case.  The requested amount is reasonable as a determination of the loss incurred and reasonably projected to be incurred in the future, as proximately caused by the Defendant's offense. 18 U.S.C. § 2259(c)(2).  The victim's submission demonstrates that the losses are attributable to the statutory sources, including medical

---

[6] The government anticipates filing a motion for leave to file restitution materials under seal for any contested restitution figures.  If necessary, the government reserves the right to file a separate restitution memorandum.

services, physical and occupational therapy and rehabilitation, transportation, housing, childcare, lost income, attorney's fees, and/or other "relevant losses incurred by the victim." 18 U.S.C. § 2259(c)(2)(A)-(F). The requested amounts do not represent a "token or nominal amount," but instead each is a "reasonable and [circumscribed] award imposed in recognition of the indisputable role of the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role." *Paroline v. United States, 572 U.S. 434, 459 (2014)*. The government therefore requests that this Court order that the Defendant pay restitution in a total amount of $5,000 to the series victims outlined herein, with that figure to be apportioned between the victims listed herein, in the respective amounts outlined herein.

## IX.    Conclusion

The government recognizes that it is difficult to quantify exactly how much time would satisfy the Court's obligation to impose a sentence that is just that would adequately deter both this Defendant and others who might commit the same types of opportunistic and depraved crimes against children, and that would protect the most vulnerable members of our society. The government recognizes that the GSR, as calculated in months, translates to a long time for a Defendant in his thirties. The pain and devastation that GAVIN has left in his wake will, hopefully for all the minor victims and their families, dissipate over time. The imagery he is responsible for helping to create will last forever, and no one knows when or how frequently it will resurface.

The parties' recommended term of incarceration is not a mechanical application of the Guidelines or even wedded to them – in fact it considers and properly serves the § 3553(a) factors. The facts of this case are extremely serious. A sentence of 120 months followed by 5 years of supervised release is a significant sentence. The government suggests that the recommended sentence addresses the severity of the Defendant's crimes, is appropriate and reasonable and serves

the statutory goals outlined in 18 U.S.C. § 3553(a) .  As such, the government urges this Court to impose it.

<div style="margin-left: 50%;">

Respectfully Submitted,

LEAH B. FOLEY
United States Attorney

</div>

Date: February 27, 2026,        By:    /s/ *Luke A. Goldworm*
                                       Luke A. Goldworm
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       One Courthouse Way
                                       Boston, MA 02210
                                       617-748-3621

**CERTIFICATE OF SERVICE**

I, Luke A. Goldworm, hereby certify that the foregoing was filed through the Electronic Court filing system and will be sent electronically to the registered participant as identified on the Notice of Electronic filing:


Date: March 5, 2026                    /s/ *Luke A. Goldworm*
                                       Luke A. Goldworm
                                       Assistant United States Attorney